## EXHIBIT 1

**Emergency Ratification Amendment and Agreement**

## EMERGENCY RATIFICATION AND AMENDMENT AGREEMENT

This EMERGENCY RATIFICATION AND AMENDMENT AGREEMENT (the "Ratification Agreement") dated as of February [__], 2019, is by and among WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association, in its capacity as administrative agent pursuant to the Credit Agreement (as hereinafter defined) acting for and on behalf of the parties thereto as lenders (in such capacity, "Agent"), WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association and PNC BANK, NATIONAL ASSOCIATION, a national banking association, each as a co-collateral agent (each individually, a "Co-Collateral Agent" and, collectively, the "Co-Collateral Agents"), the parties to the Credit Agreement as lenders (individually, each a "Lender" and collectively, "Lenders"), THE ROBERT ALLEN DURALEE GROUP, INC., a Delaware corporation, formerly known as The Robert Allen Group, Inc. ("RAG"), THE ROBERT ALLEN DURALEE GROUP, LLC, a Delaware limited liability company, formerly known as Duralee Fabrics LLC ("RAD", and together with RAG, are referred to hereinafter each individually as a "Borrower", and individually and collectively, jointly and severally, as the "Borrowers"), DÉCOR HOLDINGS, INC., a Delaware corporation ("Parent"), DÉCOR INTERMEDIATE HOLDINGS LLC, a Delaware limited liability company ("Intermediate Holdco"), ROBERT ALLEN FABRICS (CANADA) LTD., a corporation formed under the Canada Business Corporations Act ("Canadian Guarantor"), THE ROBERT ALLEN DURALEE GROUP FURNITURE, LLC, a Delaware limited liability company, formerly known as Duralee Furniture LLC("Duralee Furniture"), TECHSTYLE CONTRACT FABRICS LLC, a Delaware limited liability company ("Techstyle"), B. BERGER COMPANY LLC, a Delaware limited liability company ("B. Berger") and GAETANO FABRICS LLC, a Delaware limited liability company ("Gaetano", and together with Parent, Intermediate Holdco, Canadian Guarantor, Duralee Furniture, Techstyle and B. Berger, are referred to hereinafter each individually as a "Guarantor", and individually and collectively, jointly and severally, as the "Guarantors").

## W I T N E S S E T H:

WHEREAS, each Borrower and each Guarantor (other than the Non-Debtor Guarantors, as defined below) has commenced a case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Eastern District of New York, and each Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Cases (as defined below), Agent and Lenders made loans and advances and provided other financial or credit accommodations to Borrowers secured by substantially all assets and properties of Borrowers and Guarantors as set forth in the Existing Loan Documents (as defined below);

WHEREAS, the Bankruptcy Court (as defined below) has entered the Financing Order (defined below) pursuant to which Agent and Lenders may make post-petition loans and advances, and provide other financial accommodations, to Borrowers secured by substantially all the assets and properties of Borrowers and Guarantors as set forth in the Financing Order and the Loan Documents (as defined below);

WHEREAS, the Financing Order provides that as a condition to the making of such post-petition loans, advances and other financial accommodations, Borrowers and Guarantors shall execute and deliver this Ratification Agreement;

WHEREAS, Borrowers and Guarantors desire to reaffirm their obligations to Agent and Lenders pursuant to the Existing Loan Documents and acknowledge their continuing liabilities to Agent and Lenders thereunder in order to induce Agent and Lenders to make such post-petition loans and advances, and provide such other financial accommodations, to Borrowers; and

WHEREAS, Borrowers and Guarantors have requested that Agent and Lenders make post-petition loans and advances and provide other financial or credit accommodations to Borrowers and make certain amendments to the Credit Agreement (as defined below), and Agent and Lenders are willing to do so, subject to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, Co-Collateral Agents, Lenders, Borrowers and Guarantors mutually covenant, warrant and agree as follows:

1.    DEFINITIONS.

1.1    Additional Definitions.  As used herein, the following terms shall have the respective meanings given to them below and the Credit Agreement and the other Loan Documents shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

(a)    "Bank Product Providers" shall have the meaning set forth in the Existing Credit Agreement.

(b)    "Bankruptcy Code" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

(c)    "Bankruptcy Court" shall mean the United States Bankruptcy Court or the United States District Court for the Eastern District of New York.

(d)    "Chapter 11 Cases" shall mean the Chapter 11 cases of Borrowers and Guarantors (other than Non-Debtor Guarantors) which are being jointly administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

(e)    "Debtors" shall mean, collectively, each Borrower and each Guarantor (other than Non-Debtor Guarantors), each as Debtor and Debtor-in-Possession in the Chapter 11 Cases.

(f)    "Existing Credit Agreement" shall mean the Amended and Restated Credit and Security Agreement, dated as of March 31, 2017, by and among Borrowers, Guarantors, Agent, Co-Collateral Agents, and Lenders, as amended by Amendment No. 1 to Amended and Restated Credit and Security Agreement, dated April 13, 2018, Amendment No. 2 to Amended and Restated Credit and Security Agreement, dated July 10, 2018, and otherwise as in effect immediately prior to the Petition Date.

(g)    "Existing Loan Documents" shall mean the Loan Documents (as defined in the Existing Credit Agreement), in each case, as in effect immediately prior to the Petition Date.

(h)    "Financing Order" shall mean the

2

Emergency Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors In Possession to Obtain Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to Pre-Petition Secured Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling an Interim Hearing, and (VII) Granting Related Relief, pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Cases.

> (i)      "Lender Group" shall have the meaning set forth in the Existing Credit Agreement.

> (j)      "Non-Debtor Guarantors" shall mean, collectively: (a) Robert Allen Fabrics (Canada) Ltd., a corporation formed under the Canada Business Corporations Act, (b) Techstyle Contract Fabrics LLC, a Delaware limited liability company, (c) B. Berger Company LLC, a Delaware limited liability company, and (d) Gaetano Fabrics LLC, a Delaware limited liability company.

> (k)      "Petition Date" shall mean the date of the commencement of the Chapter 11 Cases.

> (l)      "Post-Petition Collateral" shall mean, collectively, all now existing and hereafter acquired real and personal property of each Debtor's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Agent, for the benefit of each member of the Lender Group and each of the Bank Product Providers, pursuant to the Loan Documents, the Financing Order or any other order entered or issued by the Bankruptcy Court, and shall include, without limitation:

> > (i)      all of the Pre-Petition Collateral;

> > (ii)      Accounts;

> > (iii)      Books;

> > (iv)      Chattel Paper;

> > (v)      Deposit Accounts;

> > (vi)      Goods, including Equipment and Fixtures;

> > (vii)      General Intangibles, including, without limitation, Intellectual Property and Intellectual Property Licenses;

> > (viii)      Inventory;

> > (ix)      Investment Related Property;

> > (x)      Negotiable Collateral;

> > (xi)      Supporting Obligations;

> > (xii)      Commercial Tort Claims;

> > (xiii)      money, Cash Equivalents, or other assets of such Debtor that now or hereafter come into the possession, custody, or control of Agent (or its agent or designee);

3

(xiv)    the Pledged Interests;

(xv)    Real Property; and

(xvi)    all of the proceeds (as such term is defined in the Code) and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, Books, Chattel Paper, Deposit Accounts, Equipment, Fixtures, General Intangibles (including, without limitation, Intellectual Property and Intellectual Property Licenses), Inventory, Investment Related Property, Negotiable Collateral, Real Property, Real Property leases, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing (collectively, the "Proceeds"). Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Related Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to such Debtor or Agent from time to time with respect to any of the Investment Related Property.

(m)    "Post-Petition Obligations" shall mean all Obligations (as defined in the Existing Credit Agreement) arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Cases, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Cases, and whether arising under or related to this Ratification Agreement, the Credit Agreement, the other Loan Documents, the Financing Order, by operation of law or otherwise, and whether incurred by such Borrower or Guarantor as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, debtor-in-possession facility fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(n)    "Pre-Petition Collateral" shall mean, collectively, (i) all "Collateral" as such term is defined in the Existing Credit Agreement as in effect immediately prior to the Petition Date, and (ii) all other security for the Pre-Petition Obligations as provided in the Existing Credit Agreement, and the other Existing Loan Documents immediately prior to the Petition Date.

(o)    "Pre-Petition Obligations" shall mean all Obligations (as such term is defined in the Existing Credit Agreement) arising at any time before the Petition Date, whether incurred by such Borrower or Guarantor as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(p)    "Ratification Agreement" shall mean the Emergency Ratification and Amendment Agreement, dated as of February [__], 2019, by and among Borrowers, Guarantors, Agent and Lenders, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

        1.2    <u>Amendments to Definitions</u>.

        (a)    <u>Borrowing Base</u>.  The definition of "Borrowing Base" in the Credit Agreement is hereby amended by deleting the proviso at the end of clause (b)(iii) thereof and replacing it with the following:

        "<u>Provided</u> that (x) the effective advance rate applied to slow moving Inventory shall not exceed 13% at any time, and the aggregate principal amount of Revolver Usage based on slow moving Inventory shall not exceed $2,000,000 at all times from and after the Petition Date, which amount shall be reduced by $100,000 on February 22, 2019 and on Friday of each subsequent week thereafter, and (y) the aggregate principal amount of Revolver Usage based on Eligible In-Transit Inventory shall not exceed $1,500,000 at any time, *plus*"

        (b)    <u>Collateral</u>.  All references to the term "Collateral" in the Credit Agreement, this Ratification Agreement or the other Loan Documents, or any other term referring to the security for the Pre-Petition Obligations, shall be deemed, and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

        (c)    <u>Credit Agreement</u>.  All references to the term "Credit Agreement" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean the Existing Credit Agreement, as amended by this Ratification Agreement and as ratified, assumed and adopted by each Borrower and each Guarantor pursuant to the terms hereof and the Financing Order, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

        (d)    <u>Debtors</u>.  All references to Debtors, including, without limitation, to the terms "Borrower", "Borrowers", "Guarantor", "Guarantor", "Guarantors", "Loan Party" or "Loan Parties" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean and include the Debtors as defined herein, and their successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation); <u>provided</u>, <u>that</u>, each Non-Debtor Guarantor is not a Debtor and shall not be deemed to be a Debtor.

        (e)    <u>Interest Rate Margin</u>.  All references to the term "Interest Rate Margin" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, as follows:

        " '<u>Interest Rate Margin</u>' means, as of any date of determination (with respect to any portion of the outstanding Advances on such date), a rate equal to 3.75% per annum."

        (f)    <u>Inventory Loan Limit</u>.  All references to the term "Maximum Revolver Amount" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, as follows:

        " '<u>Inventory Loan Limit</u>' means $20,000,000."

(g)    Loan Documents.  All references to the term "Loan Documents" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to include, in addition and not in limitation, this Ratification Agreement and all of the Existing Loan Documents, as ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms hereof, as amended and supplemented hereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(h)    Material Adverse Change.  All references to the term "Material Adverse Change", "material adverse change" or "material adverse effect" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to add at the end thereof:  "provided, that, the commencement of the Chapter 11 Cases shall not constitute a material adverse change".

(i)    Maximum Credit.  All references to the term "Maximum Credit" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed and each such reference in the Loan Documents is hereby amended to mean, the amount of $30,000,000.

(j)    Maximum Revolver Amount.  All references to the term "Maximum Revolver Amount" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, as follows:

" 'Maximum Revolver Amount' means $30,000,000, decreased by the amount of reductions in the Commitments made in accordance with Section 2.11 of this Agreement."

(k)    Obligations.  All references to the term "Obligations" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean both the Pre-Petition Obligations and the Post-Petition Obligations.

1.3    Interpretation.

(a)    For purposes of this Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Credit Agreement.

(b)    All references to the term "Agent", "Co-Collateral Agent", "Lender", "Borrower", "Guarantor", "Debtor" or any other person pursuant to the definitions in the recitals hereto or otherwise shall include its respective successors and assigns.

(c)    All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular unless the context of such usage requires otherwise.

(d)    All terms not specifically defined herein which are defined in the Uniform Commercial Code, as in effect in the State of New York as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

2.    ACKNOWLEDGMENT.

2.1     Pre-Petition Obligations.  Each Borrower and Guarantor hereby acknowledges, confirms and agrees that, as of February 11, 2019, Borrowers are indebted to Agent and Lenders in respect of all Pre-Petition Obligations in the aggregate principal amount of not less than $24,597,595.24, consisting of (a) Advances made pursuant to the Existing Loan Documents in the aggregate principal amount of not less than $23,779,615.57, together with interest accrued and accruing thereon, and (b) Letter of Credit Usage in the amount of not less than $817,979.67, together with interest accrued and accruing thereon, and all costs, expenses, fees (including attorneys' fees and legal expenses) and (c) other charges now or hereafter owed by Borrowers to Agent and Lenders, all of which are unconditionally owing by Borrowers to Agent and Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

2.2     Guaranteed Obligations.  Each Guarantor hereby acknowledges, confirms and agrees that:

(a)     all obligations of such Guarantor under the Loan Documents are unconditionally owing by such Guarantor to Agent and Lenders without offset, defense or counterclaim of any kind, nature and description whatsoever, and

(b)     the absolute and unconditional guarantee of the payment of the Pre-Petition Obligations by such Guarantor pursuant to the Loan Documents extends to all Post-Petition Obligations, subject only to the limitations set forth in the Loan Documents.

2.3     Acknowledgment of Security Interests.  Each Borrower and each Guarantor hereby acknowledges, confirms and agrees that Agent, for the benefit of each member of the Lender Group and each of the Bank Product Providers, has and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Agent pursuant to the Existing Loan Documents as in effect immediately prior to the Petition Date to secure all of the Obligations, as well as valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted to Agent, for the benefit of each member of the Lender Group and each of the Bank Product Providers, under the Financing Order or hereunder or under any of the other Loan Documents or otherwise granted to or held by Agent, in each case, subject only to liens or encumbrances expressly permitted by the Credit Agreement and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Agent and Lenders.

2.4     Binding Effect of Documents.  Each Borrower and each Guarantor hereby acknowledges, confirms and agrees that: (a) each of the Existing Loan Documents to which it is a party was duly executed and delivered to Agent and Lenders by such Borrower or Guarantor and each is in full force and effect as of the date hereof, (b) the agreements and obligations of such Borrower or Guarantor contained in the Existing Loan Documents constitute the legal, valid and binding obligations of such Borrower or Guarantor enforceable against it in accordance with the terms thereof, and such Borrower or Guarantor has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) Agent and Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in the Loan Documents and the Financing Order.

3.      ADOPTION AND RATIFICATION.

Each Borrower and each Guarantor hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Existing Loan Documents to which it is a party and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Existing Loan Documents, as amended by this Ratification Agreement, and in accordance with the Financing Order.  All of the Existing Loan

Documents are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Borrowers and Guarantors (other than the Non-Debtor Guarantors), each as Debtor and Debtor-in-Possession, and by each Non-Debtor Guarantor and considered as agreements between such Borrowers or Guarantors, on the one hand, and Agent and Lenders, on the other hand.  Each Borrower and each Guarantor hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Existing Loan Documents, as amended and supplemented pursuant hereto and the Financing Order, and each Borrower and each Guarantor (other than Non-Debtor Guarantors), as Debtor and Debtor-in-Possession, and each Non-Debtor Guarantor agrees to be fully bound by the terms of the Loan Documents to which such Borrower or Guarantor is a party.

    4.    GRANT OF SECURITY INTEREST.

        As collateral security for the prompt performance, observance and payment in full of all of the Post-Petition Obligations (and to the extent authorized by Court order the Pre-Petition Obligations), Borrowers and Guarantors (other than the Non-Debtor Guarantors), each as Debtor and Debtor-in-Possession, and Non-Debtor Guarantors hereby grant, pledge and assign to Agent, for the benefit of each member of the Lender Group and each of the Bank Product Providers, and also confirm, reaffirm and restate the prior grant to Agent of, continuing security interests in and liens upon, and rights of setoff against, all of the Collateral.

    5.    ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS.

        In addition to the continuing representations, warranties and covenants heretofore and hereafter made by Borrowers and Guarantors to Agent, Co-Collateral Agents and Lenders, whether pursuant to the Loan Documents or otherwise, and not in limitation thereof, each Borrower and Guarantor hereby represents, warrants and covenants to Agent, Co-Collateral Agents and Lenders the following (which shall survive the execution and delivery of this Ratification Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition of the making of Advances by Agent and Lenders or the issuance of Letters of Credit:

        5.1    Use of Proceeds.  All Advances provided by Agent or any Lender to Borrowers or Letters of Credit issued pursuant to the Financing Orders, the Credit Agreement or otherwise, shall be used by Borrowers for general operating and working capital purposes in the ordinary course of business of Borrowers in accordance with the Financing Order.  Unless authorized by the Bankruptcy Court and approved by Agent in writing, no portion of any administrative expense claim or other claim relating to the Chapter 11 Cases shall be paid with the proceeds of such Advances or Letters of Credit provided or issued by (or on behalf of) Agent and Lenders to Borrowers, other than those administrative expense claims and other claims relating to the Chapter 11 Cases directly attributable to the operation of the business of any Borrower or any Guarantor in the ordinary course of such business in accordance with the Loan Documents.

        5.2    Ratification of Blocked Account Agreements.  To the extent Agent deems it necessary in its discretion and upon Agent's request, Borrowers and Guarantors shall promptly provide Agent with evidence, in form and substance satisfactory to Agent, that the Control Agreements (as defined in the Existing Credit Agreement) and other deposit account arrangements provided for under Sections 6.12(c) and (j) of the Existing Credit Agreement have been ratified and amended by the parties thereto, or their respective successors in interest, in form and substance satisfactory to Agent, to reflect the commencement of the Chapter 11 Cases, that each Borrower and each Guarantor (other than Non-Debtor Guarantors), each as Debtor and Debtor-in-Possession, is the successor in interest to such Borrower or Guarantor, that the Obligations include both the Pre-Petition Obligations and the Post-

Petition Obligations, that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for.

       5.3    <u>ERISA</u>.  Each Loan Party hereby represents and warrants with, to and in favor of Agent and Lenders that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of any Borrower or Guarantor arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "PBGC") or the contributing sponsor of, or a member of the controlled group thereof, any pension benefit plan of any Borrower or Guarantor and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of any Borrower or Guarantor.

      6.    <u>DIP FACILITY FEE</u>.

       Borrowers shall pay to Agent, for the account of Lenders (on a pro rata basis according to their respective Commitments), a debtor-in-possession financing facility fee, in the amount of $300,000, on account of the financing provided by Agent and Lenders to Borrowers in the Chapter 11 Cases, which fee shall be fully earned and due and payable on the date hereof and which may be charged directly to the loan account of any Borrower maintained by Agent, which shall not be paid during the period the Financing Order is in effect.

      7.    <u>AMENDMENTS</u>.

       7.1    <u>Limits and Sublimits</u>.  Section 2.1 of the Credit Agreement is hereby amended by adding the following new clause (e) at the end thereof:

          "(e)    All limits and sublimits set forth in this Agreement, and any formula or other provision to which a limit or sublimit may apply, shall be determined on an aggregate basis considering together both the Pre-Petition Obligations and the Post-Petition Obligations."

       7.2    <u>Swing Loan Limit</u>.  The first sentence of Section 2.3(b) of the Credit Agreement is hereby amended by deleting the reference to "$4,250,000" contained therein and replacing it with "$3,000,000".

       7.3    <u>Payments</u>.  Section 2.4(e) of the Credit Agreement is hereby amended by adding the following new clause (vii) at the end thereof:

          "(vii) Without limiting the generality of the foregoing, Agent may, in its discretion, apply any such payments or proceeds first to the Pre-Petition Obligations until such Pre-Petition Obligations are paid and satisfied in full."

       7.4    <u>Maturity</u>. Section 2.9 of the Credit Agreement is hereby amended by deleting the first sentence contained therein and replacing it with the following:

          "This Agreement shall continue in full force and effect for a term ending on the earlier to occur of (i) June 15, 2019 (the "Maturity Date"), (ii) the confirmation of a plan of reorganization for any Loan Party in the Chapter 11 Cases, or (iii) the last termination date set forth in the Financing Order (the earlier to occur of clauses (i), (ii) and (iii) referred to herein as the "Termination

Date"); provided, that, this Agreement and all other Loan Documents must be terminated simultaneously."

7.5     Letter of Credit Usage Limit.  Section 2.13(b)(iii) of the Credit Agreement is hereby amended by deleting the reference to "$4,000,000" contained therein and replacing it with "1,000,000".

7.6     Additional Financial Reporting Requirements.  Section 6.1 of the Credit Agreement is hereby amended by adding the following new sentence at the end thereof:

> "Borrowers shall also deliver to Agent copies of all financial reports, schedules and other materials and information at any time furnished by or on behalf of any Borrower or any Guarantor to the Bankruptcy Court, or the U.S. Trustee or to any creditors' committee or such Borrower's or Guarantor's shareholders, concurrently with the delivery thereof to the Bankruptcy Court, creditors' committee, U.S. Trustee or shareholders, as the case may be."

7.7     Indebtedness.  Notwithstanding anything to the contrary contained in Section 7.1 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to, create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any new Indebtedness, without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender).

7.8     Liens.  Notwithstanding anything to the contrary contained in Section 7.2 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to, create, incur, assume or suffer to exist, directly or indirectly, any new Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender).

7.9     Disposal of Assets.  Notwithstanding anything to the contrary contained in Section 7.4 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any portion of any Loan Party's or its Subsidiaries' Collateral or other assets, including, without limitation, assume, reject or assign any leasehold interest or enter into any agreement to return Inventory to vendor, whether pursuant to section 546 of the Bankruptcy Code or otherwise, without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender), except to the extent specifically set forth in the Financing Order.

7.10     Prepayments and Amendments.  Notwithstanding anything to the contrary contained in Section 7.7(a) of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to make any payment on account of, or optionally prepay, redeem, defease, purchase, or otherwise acquire, any Permitted Intercompany Advances, without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender), except to the extent specifically set forth in the Financing Order.

7.11    Restricted Junior Payments.  Notwithstanding anything to the contrary contained in Section 7.9 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to make any Restricted Junior Payments set forth in such Section 7.9 or otherwise, without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender), except to the extent specifically set forth in the Financing Order.

7.12    Investments; Controlled Investments.  Notwithstanding anything to the contrary contained in Section 7.11 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to, directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment, without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender), except to the extent specifically set forth in the Financing Order.

7.13    Minimum Excess Availability.  Section 8(a) of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    Minimum Excess Availability.  [Reserved]."

7.14    Fixed Charge Coverage Ratio.  Section 8(b) of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

"(b)    Fixed Charge Coverage Ratio.  [Reserved]."

7.15    Events of Default.  Section 9 of the Credit Agreement is hereby amended as follows:

(a)    Section 9.4 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

"9.4    If an Insolvency Proceeding is commenced by a Loan Party or any of its Subsidiaries (other than Debtors);"

(b)    Section 9.5 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

"9.5    If an Insolvency Proceeding is commenced against a Loan Party or any of its Subsidiaries (other than Debtors) and any of the following events occur: (a) such Loan Party or such Subsidiary (other than Debtors) consents to the institution of such Insolvency Proceeding against it, (b) the petition commencing the Insolvency Proceeding is not timely controverted, (c) the petition commencing the Insolvency Proceeding is not dismissed within sixty (60) calendar days of the date of the filing thereof, (d) an interim trustee is appointed to take possession of all or any substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of, such Loan Party or its Subsidiary (other than Debtors), or (e) an order for relief shall have been issued or entered therein; provided that the Lender Group shall have no obligation to provide any extension of credit to any Borrower during such 60 calendar day period;"

(c)    Section 9.6 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

"9.6 If any Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of such Loan Party and its Subsidiaries, taken as a whole, or a trustee, receiver or custodian is appointed for any Loan Party, or any of their respective properties;"

(d)      Section 9 of the Credit Agreement is hereby amended by (i) deleting the reference to the word "or" at the end of Section 9.15, (ii) replacing the period appearing at the end of Section 9.16 with a semicolon, and (iii) adding the following:

"9.17    the occurrence of any condition or event which permits Agent, Co-Collateral Agents and Lenders to exercise any of the remedies set forth in the Financing Order, including, without limitation, the failure to pay all administrative expense claims then due in accordance with the Financing Order (except as set forth in the Loan Documents, as amended by the Ratification Agreement) or any other "Event of Default" (as defined in the Financing Order);

9.18    the termination or non-renewal of the Loan Documents as provided for in the Financing Order;

9.19    the expiration of the Financing Order;

9.20    any act, condition or event occurring after the Petition Date that has or would reasonably expect to result in the occurrence of a Material Adverse Change upon the assets of any Loan Party, or the Collateral or the rights and remedies of the Lender Group under the Credit Agreement or any other Loan Documents or the Financing Order;

9.21    conversion of any Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

9.22    dismissal of any Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

9.23    the grant of a lien on or other interest in any property of any Loan Party, other than a Permitted Lien or a lien or encumbrance permitted by the Financing Order, which is superior to or ranks in parity with Agent's security interest in or lien upon the Collateral; or

9.24    the failure of any Borrower or any Guarantor to comply with the Financing Order or the Ratification Agreement or any terms therein, or the Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Agent (and no such consent shall be implied from any other authorization or acquiescence by Agent or any Lender)."

7.16    <u>Choice of Law and Venue; Jury Trial Waiver</u>.  Section 13(a) of the Credit Agreement is hereby amended by deleting the period and adding the following at the end thereof:

"EXCEPT TO THE EXTENT THAT THE PROVISIONS OF THE BANKRUPTCY CODE ARE APPLICABLE AND SPECIFICALLY CONFLICT WITH THE FOREGOING."

        7.17   <u>Letter of Credit Fees</u>.  Schedule 2.12 to the Credit Agreement is hereby amended by deleting the reference to "2.50%" contained therein and replacing it with "3.50%".

        7.18   <u>Schedule of Commitments</u>.  Schedule C-2 to the Credit Agreement is hereby amended by deleting such Schedule in its entirety and replacing it with Schedule C-2 in the form attached hereto as <u>Exhibit A</u> to this Ratification Agreement.

     8.   <u>CONDITIONS PRECEDENT</u>.

        In addition to any other conditions contained herein or the Credit Agreement, as in effect immediately prior to the Petition Date, with respect to the Advances and other financial accommodations available to Borrowers (all of which conditions, except as modified or made pursuant to this Ratification Agreement shall remain applicable to the Advances and be applicable to other financial accommodations available to Borrowers), the following are conditions to Agent's and Lenders' obligation to extend further loans, advances or other financial accommodations to Borrowers pursuant to the Credit Agreement:

        8.1   the execution and delivery of this Ratification Agreement and all other Loan Documents to be delivered in connection herewith by the Loan Parties in form and substance satisfactory to Agent;

        8.2   the execution or delivery to Agent and Lenders of all other Loan Documents, and other agreements, documents and instruments which, in the good faith judgment, of Agent are necessary or appropriate.  The implementation of the terms of this Ratification Agreement and the other Loan Documents, as modified pursuant to this Ratification Agreement, all of which contains provisions, representations, warranties, covenants and Events of Default, as are satisfactory to Agent and its counsel; and

        8.3   no Event of Default shall have occurred or be existing under any of the Existing Loan Documents, as modified pursuant hereto, and assumed by Borrowers and Guarantors.

     9.   <u>MISCELLANEOUS</u>.

        9.1   <u>Amendments and Waivers</u>.  Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

        9.2   <u>Further Assurances</u>.  Each Loan Party shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments, UCC financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by Agent and Lenders of all the rights and remedies hereunder, under any of the other Loan Documents, the Financing Order or applicable law with respect to the Collateral, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Agent's opinion to evidence, perfect, maintain and enforce the security interests of Agent and Lenders, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other  Loan Documents or the Financing Order.  Upon the request of Agent, at any time and from time to time, each Loan Party

shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Agent and Lenders with respect to the Intellectual Property with the United States Patent and Trademark Office, the financing statements, mortgages, deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Agent and Lenders such instruments evidencing items of Collateral as may be requested by Agent.

9.3     Headings.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

9.4     Counterparts.  This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.  In making proof of this Ratification Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.  Delivery of an executed counterpart of this Ratification Agreement by telefacsimile or other electronic method of transmission shall have the same force and effect as delivery of an original executed counterpart of this Ratification Agreement.  Any party delivering an executed counterpart of this Ratification Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Ratification Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Ratification Agreement as to such party or any other party.

9.5     Additional Events of Default.  The parties hereto acknowledge, confirm and agree that the failure of any Loan Party to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by such Loan Party in connection herewith shall constitute an Event of Default under the Loan Documents.

9.6     Costs and Expenses.  Borrowers shall pay to Agent and Lenders on demand all costs and expenses that Agent or Lenders pay or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Ratification Agreement and the other Loan Documents and the Financing Order, including, without limitation: (a) reasonable attorneys' and paralegals' fees and disbursements of counsel to, and reasonable fees and expenses of consultants, accountants and other professionals retained by, Agent and Lenders; (b) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Ratification Agreement, the other Loan Documents, the Financing Order and the transactions contemplated thereby; (c) taxes, fees and other charges for recording any agreements or documents with any governmental authority, and the filing of UCC financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of Agent in the Collateral; (d) sums paid or incurred to pay any amount or take any action required of the Loan Parties under the Loan Documents or the Financing Order that Loan Parties fail to pay or take; (e) costs of appraisals, inspections and verifications of the Collateral and including travel, lodging, and meals for inspections of the Collateral and the Debtors' operations by Agent or its agents and to attend court hearings or otherwise in connection with the Chapter 11 Cases; (f) costs and expenses of preserving and protecting the Collateral; (g) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Agent during the course of periodic field examinations of the Collateral and Debtors' operations, plus a per diem charge at the customary rate for Agent's examiners in the field and office; and (h) costs and expenses (including attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce the security interests and liens of Agent, sell or otherwise realize upon the Collateral, and otherwise enforce the provisions of this Ratification Agreement, the other Loan Documents and the Financing Order, or to defend any claims made or threatened against member of the Lender Group arising out of the transactions

14

contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters).  The foregoing shall not be construed to limit any other provisions of the Loan Documents regarding costs and expenses to be paid by Borrowers.  All sums provided for in this Section 9.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Loan Documents.  Agent is hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Agent with respect to any Loan Party.

9.7    Effectiveness.  This Ratification Agreement shall become effective upon the satisfaction of the conditions precedent set forth in Section 8 hereof, and the entry of the Financing Order.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as Agent, a Co-Collateral
Agent and a Lender

By:_____
Name:_____
Title:_____

<u>BORROWERS</u>

THE ROBERT ALLEN DURALEE GROUP, INC.,
as Debtor and Debtor-in-Possession

By: _____
Name:
Title:

THE ROBERT ALLEN DURALEE GROUP, LLC,
as Debtor and Debtor-in-Possession

By: _____
Name:
Title:

<u>GUARANTORS</u>:

DÉCOR HOLDINGS, INC.,
as Debtor and Debtor-in-Possession

By: _____
Name:
Title:

DÉCOR INTERMEDIATE HOLDINGS LLC,
as Debtor and Debtor-in-Possession

By: _____
Name:
Title:

THE ROBERT ALLEN DURALEE GROUP
FURNITURE, LLC,
as Debtor and Debtor-in-Possession

By: _____
Name:
Title:


TECHSTYLE CONTRACT FABRICS LLC

By: _____
Name:
Title:


B. BERGER COMPANY LLC

By: _____
Name:
Title:


GAETANO FABRICS LLC

By: _____
Name:
Title:


ROBERT ALLEN FABRICS (CANADA) LTD.

By: _____
Name:
Title:

PNC BANK, NATIONAL ASSOCIATION,
as a Co-Collateral Agent and a Lender

By:_____
Name:_____
Title:_____

EXHIBIT A
to
RATIFICATION AND AMENDMENT AGREEMENT


**COMMITMENT SCHEDULE**


(see attached)

**Schedule C-2**

**to**

**Credit Agreement**

**<u>Commitments</u>**

| <u>Lender</u> | <u>Revolver Commitment</u> |
|---|---|
| Wells Fargo Bank, National Association | $15,000,000 |
| PNC Bank, National Association | $15,000,000 |
| **Total:** | **$30,000,000** |

## EXHIBIT 2

**Emergency Two-Week Budget**

**Décor Holdings, Inc., et al**
Weekly Cash Flow Budget ($000s)

| | | POST-PETITION | | |
| --- | --- | --- | --- | --- |
| | | 2/23 | p/e 2/26 | Total |
| **CASH RECEIPTS** | | | | |
| Collections | - | 2,004.0 | 1,438.4 | 3,442.4 |
| | | | | |
| **CASH DISBURSEMENTS** | | | | |
| **Operating Expenses** | | | | |
| Inventory Purchases | - | 374.6 | 561.8 | 936.4 |
| Freight In/Out, Customs & Duties | - | 56.2 | 84.3 | 140.5 |
| Gross Payroll | - | 35.0 | 915.7 | 950.7 |
| Group Insurance | - | 164.1 | 69.5 | 233.6 |
| Rent | - | - | - | - |
| Commissions | - | - | - | - |
| G&A Expenses | - | 104.6 | 162.3 | 266.8 |
| Merchant Card Fees | - | 0.2 | 7.8 | 8.0 |
| Bank Fees, Interest, Misc | - | 119.1 | - | 119.1 |
| Total Operating Disbursements | - | 853.7 | 1,801.4 | 2,655.1 |
| | | | | |
| **Bankruptcy Expenses** | | | | |
| Debtor Professionals | | | | - |
| Lender Professionals | | | | - |
| Creditor Professionals | | | | - |
| US Trustee | | | | - |
| DIP Lender Fee | | | | - |
| Adequate Assurance Deposit | | | | - |
| Showroom Closure | - | 116.0 | - | 116.0 |
| Pre-petition Insurance | - | 60.0 | - | 60.0 |
| Pre-petition Commission | - | 6.2 | - | 6.2 |
| Pre-petition Shipping | | 706.5 | 250.0 | 956.5 |
| Total Bankruptcy Expenses | - | 888.7 | 250.0 | 1,138.7 |
| | | | | |
| TOTAL CASH DISBURSEMENTS | - | 1,742.4 | 2,051.4 | 3,793.8 |
| | | | | |
| Weekly Cash Flow / (Deficit) | - | 261.6 | (613.0) | (351.4) |